## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SA'RAYA HARDEN, | : | NO. 3:23-cv-01631-MEM |
| ADMINISTRATOR OF THE | : | |
| ESTATE OF ADREYA HARDEN, | : | CIVIL ACTION |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| WEST SIDE CAREER AND | : | |
| TECHNOLOGY CENTER, WYOMING | : | |
| VALLEY SCHOOL DISTRICT, | : | |
| RICHARD RAVA in his individual | : | |
| Capacity, and DOE(S) 1-10, | : | |
| *Defendants*. | : | |

## PLAINTIFF'S COMPREHNSIVE BRIEF IN RESPONSE TO DEFENDANTS WEST SIDE CAREER AND TECHNOLOGY CENTER, WYOMING VALLEY SCHOOL DISTRICT, AND RICHARD RAVA'S MOTIONS FOR SUMMARY JUDGMENT

Ryan P. Dickinson, Esq. (PA #332378)
Nathaniel L. Foote, Esq. (PA #318998)
ryan@vca.law
nate@vca.law
Andreozzi + Foote
4503 North Front Street
Harrisburg, PA 17110
Ph: 717.525.9124 | Fax: 717.525.9143
*Attorneys for Plaintiffs*

Plaintiff Sa'Raya Harden, Administrator of the Estate of Adreya Harden, files this Brief in Opposition to Defendants West Side Career and Technology Center ("Tech"), Richard Rava ("Rava"), and Wyoming Valley West School District's ("District") Motions for Summary Judgment. At the same time, Plaintiff files her Statement of Material Facts, including an Appendix with relevant portions of the record.

## SUMMARY OF THE ARGUMENT

Adreya Harden ("Adreya") was a transgender female student who committed suicide while enrolled as a student at Defendant West Side Career and Technology Center ("Tech"). During Adreya's brief time at Tech, she was subjected to intense gender-based discriminatory bullying by T.W., her classmate, which led to her taking her own life days later.

As the court will read in detail, T.W. was initially removed from Adreya's class by teacher Thomas Pieczynski ("Pieczynski") for T.W.'s gender-based abuse of Adreya.  However, Tech's Principal, Rava, released T.W. back to class with Adreya, which allowed Adreya's gender-based discrimination to continue.

Further, though T.W.' treatment of Adreya clearly fell under Tech's discrimination policy, Rava ignored Tech policy and treated Adreya's abuse as

simple non-discriminatory bullying. Rava's decision meant Adreya was not provided with the resources offered to students under Tech's discrimination policy.

Days later, Adreya was dead by suicide.

Worse still, at the time of Adreya's death, Tech was in violation of Pennsylvania law regarding student-suicide prevention. Years prior, Pennsylvania mandated that schools – Tech included – adopt suicide prevention policies by the 2015-2016 school year. However, Tech had still not adopted a conforming policy when Adreya committed suicide in 2019, and did not do so until 2022.

Tech's failure to adopt a suicide prevention policy, train on it, or ensure Rava followed Tech discrimination policy constitutes a prototypical "failure to train" under Section 1983, leading directly to Adreya's untimely death.

Due to Adreya's suicide, Plaintiff brought claims against three Defendants: (1) West Side Career and Technology Center, (2) Wyoming Valley School District, and (3) Richard Rava.

Plaintiff recognizes certain of these claims are untenable after discovery. To not burden the Court, Plaintiff consents to entry of summary judgment as to all counts against Wyoming Valley School District (Counts VI and VIII) as well as the count brought under the Equal Protection Clause of the Fourteenth Amendment against Defendant Tech (Count VII).

However, summary judgment is inappropriate as to Plaintiff's failure to train claims against Defendants Tech and Rava (Count V) as well as Plaintiff's individual liability claim against Defendant Rava under the Equal Protection Clause (Count IX).  Plaintiff thus requests this Court deny summary judgment for Defendants on Count V and Count IX, and consents to dismissal of Counts VI, VII, and VIII.[1]

## PROCEDURAL HISTORY

Plaintiff Sa'Raya Harden filed her Complaint on October 10, 2023. (ECF #1) On December 21, 2023, all three Defendants filed a Motion to Dismiss the Complaint. (ECF #2)

On August 2, 2024, this Court dismissed Plaintiff's Title IX claims against the District and Tech without prejudice and denied the Motion to Dismiss in all other respects. (ECF #26)

On August 21, 2024, the parties filed a joint motion to bifurcate discovery and proceed with discovery on liability only. (ECF #28) On August 22, 2024, the parties stipulated to dismissal of all Title IX claims (Counts I-IV) as to all parties. (ECF #29) On August 23, 2024, this Court granted the parties' joint motion to bifurcate discovery. (ECF #30) On November 11, 2024, the parties stipulated to dismiss

---

[1] All other counts in Plaintiff's Complaint(s) not mentioned here were previously disposed of by motion and/or stipulation.

Counts X-XII against Doe Defendants. (ECF #34) On December 2, 2024, Defendants Tech, the District, and Rava filed a Motion for Summary Judgment. (ECF #35) Plaintiff now responds in opposition to Tech and Rava's Motions.

## STANDARD OF REVIEW

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where "it might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. If the court, viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine dispute as to any material fact, then summary judgment is proper. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## QUESTIONS PRESENTED

I.  **ARE THE TECH DEFENDANTS ENTITLED TO JUDGMENT AS A MATTER OF LAW FOR COUNT V (SECTION 1983 FAILURE TO TRAIN)?**

Suggested Answer: No.

II.    **IS INDIVIDUAL DEFENDANT RAVA ENTITLED TO JUDGMENT AS A MATTER OF LAW UNDER THE DOCTRINE OF QUALIFIED IMMUNITY ON COUNT IX?**

Suggested Answer: No.

## LEGAL ARGUMENT

I.    **Plaintiff has established a Section 1983 failure to train claim.**

Defendants Tech and Rava argue Defendants Tech and Rava are entitled to summary judgment on Plaintiff's failure to train claim. Defendants Tech and Rava argue the record fails to substantiate: a constitutional violation committed by a state actor; a lack of policies, training, and procedures addressing gender non-conforming students and suicide awareness; a pattern-of-violation or a single violation of students' rights (deliberate indifference); and causation between a violative act and harm. See Defendants' Memorandum of Law (hereinafter "Br.").

However, the record clearly establishes each of these elements, and Defendants Tech and Rava's request for summary judgment on this issue must be denied.

(a)    **Defendant Rava violated Decedent's constitutional rights by deliberate indifference to Decedent's gender-based harassment leading to Decedent's suicide.**

Defendants Tech and Rava argue that Plaintiff has failed to prove a constitutional violation committed by a state actor as "[t]here is no evidence to

support that a state actor refused to address sex-based student-on-student harassment." Br. at 14. This is categorically untrue. As an initial matter, it is undisputed a student has a constitutional right to be free from sex discrimination in school. S.K. v. N. Allegheny Sch. Dist., 168 F. Supp. 3d 786, 812 (W.D. Pa. 2016) ("The Equal Protection Clause does confer a constitutional right to be free from sex discrimination."), citing Hill v. Cundiff, 797 F.3d 948, 976 (11th Cir. 2015).

Here, Adreya's harasser, T.W., was kicked out of class and referred to Tech administration after he bullied Adreya based on Adreya's gender identity and sex. See Defendants' Statement of Material Facts (hereinafter "DSOMF") at ¶¶ 109-117; see Plaintiff's Statement of Material Facts (hereinafter "PSOMF") at ¶ 241-242.

Tech Teacher Thomas Pieczynski witnessed the harassment and removed T.W. from class. PSOMF at ¶ 241, 244. In describing the bullying, Pieczynski testified he had "never seen that level of confrontation or aggressiveness from a student to particularly a, you know, transgender student." Id. at ¶ 243. Pieczynski characterized the harassment as based on Adreya's sexual orientation. Id. at ¶ 246.

Rava ("Rava") was informed of this harassment. Id. at ¶ 247. Rava did not notify either Tech's Compliance Officer or Tech's Title IX Coordinator of the harassment despite Tech's bullying policy requiring involvement of both in incidents of discriminatory harassment. Id. at ¶¶ 255-256; 236.

Rava, as building administrator, was also separately required under Tech's discrimination policy to "promptly notify the Title IX Coordinator of all reports of discrimination," but failed to do so. Id. at ¶ 239, 253, 256.

Instead, Rava permitted T.W. to return to class with Adreya where T.W. continued to discriminatorily harass Adreya. Id. at ¶¶ 247-248. While Rava ultimately suspended T.W., DSOMF at ¶ 122, the damage had already been done, and the constitutional violation had already occurred. DiSalvio v. Lower Merion High School Dist., 158 F.Supp.2d 553, 564 (E.D. Pa. 2001) (when state actors are "on notice about . . . harassment and knew or should have known that their nonfeasance would allow the harassment to continue or worsen . . . their desire that it can continue can be implied.")

It must be noted, too, that despite the incident clearly being referred to Rava as an instance of discrimination, PSOMF at ¶ 246, Rava chose to treat it as a "bullying-like" incident. DSOMF at ¶ 137. This was not a meaningless oversight.

Under Tech's policies, students like Adreya who are subjected to discrimination are afforded a raft of resources not afforded under the school's bullying policy, including counseling. PSOMF at ¶ 238. Further, under Tech's policies, the school's resource coordinator and Title IX coordinator are required to be notified when discriminatory bullying occurs against a student. Id. at ¶ 236. This did not happen here. Id. at ¶¶ 250-256.

Tech's discrimination policy requires that, upon receiving a report regarding discrimination, "[t]he Title IX Coordinator shall promptly contact the complainant regarding the report to gather additional information as necessary, and **to discuss the availability of supportive measures**." Id. at ¶ 239 (emphasis added).  As Rava did not follow this policy, Adreya was not afforded the resources available under Tech's own policies to students who are subjected to discrimination. See id. at ¶ 251.

Indeed, Rava did not speak with Adreya **at all** about the incident. PSOMF at ¶ 254. Tech also did not even notify Adreya's mother that Adreya was subjected to an entire day of discriminatory bullying. See DSOMF at ¶ 126

Accordingly, Rava violated Adreya's constitutional rights by permitting a student who had already discriminated against her to return to class to continue his discrimination.  Rava then continued his violative conduct by failing to remedy gender-based harassment as Tech policy required.  As such, Plaintiff can prove that Rava violated Adreya's constitutional rights.

    **(b)**   **Tech did not provide policies, training, and procedures sufficient to address gender-based discriminatory bullying and the related risk of suicide, which amounted to unconstitutional discrimination.**

Defendants Tech and Rava argue Plaintiff cannot establish Tech lacked policies, training, and procedures to address gender non-conforming students and suicide. Br. at 15. Again, this is incorrect.

As noted above, Rava's treatment of acknowledged discrimination as simple "bullying-like" behavior shows an obvious lack of training regarding discrimination. So does Rava's failure to follow proper protocols by notifying Tech's Title XI Coordinator and Compliance Officer. Again, Rava's response robbed Adreya of resources and support that could have stopped Adreya's suicide.

Further, Tech's policies and training failed to abide by Pennsylvania law for years by not adopting a suicide prevention policy. In 2014, Pennsylvania mandated that public schools adopt a suicide prevention policy by the 2015-2016 school year. PSOMF at ¶ 227.

On June 26, 2014, Act 71 was signed into law in Pennsylvania. Act 71 added section 1526 of the School Code, 24 PS § 15-1526, which specifically required schools to: (1) adopt a youth suicide awareness and prevention policy; and (2) provide ongoing professional development in youth suicide awareness and prevention for professional educators in building serving students in grades 6-12. Id.

Tech did not adopt such a policy by 2015, nor did it do so in 2016, 2017, 2018, 2019, 2020, or 2021. See DSOMF at ¶ 151.

And Tech absolutely knew of Tech's obligations under Act 71. Tech was receiving direct notice of its need to adopt a conforming suicide policy. Tech receives regular updates from the Pennsylvania School Board Association ("PSBA") regarding necessary policy changes. PSOMF at ¶ 228.

In April 2015, Tech received a notice from the PSBA regarding Act 71. Id. at

¶ 229. After detailing a model suicide prevention policy, the PSBA notice states:

> The policy also includes a section on Students With Disabilities to ensure that such students, identified as being at risk for suicide or who attempt suicide, are assisted by the appropriate team and receive the necessary special education services and accommodations in accordance with applicable law, regulations and Joint Operating Committee policy.

Id. Multiple federal courts have held that gender dysphoria can constitute a disability

under, for example, the Americans with Disabilities Act. Doe v. Triangle Doughnuts,

LLC, 472 F. Supp. 3d 115, 134 (E.D. Pa. 2020); Williams v. Kincaid, 45 F.4th 759,

773 (4th Cir. 2022); Doe v. Horne, 2024 U.S. Dist. LEXIS 109586, at *5 (D. Ariz.

June 21, 2024); Doe v. Mass. Dep't of Corr., 2018 U.S. Dist. LEXIS 99925, at *6 (D.

Mass. June 14, 2018)

Yet there is no evidence Tech took heed of either the passage of Act 71 or the

related notices from the PSBA. Indeed, it was not until March of 2022, **three years**

**after Adreya's suicide**, that Tech chose to conform to Act 71 and adopt a suicide

policy. DSOMF at ¶ 151.

Tech and Rava try to obfuscate Tech's noncompliance with Act 81 by claiming

Tech's Student Assistance Program ("SAP") was the functional equivalent of a

suicide policy. See Br. at 17-18. However, even a cursory review of Tech's SAP

policy reveals that the policy does not even mention suicide and did not comply with

Act 71, 24 PS § 15-1526. PSOMF at ¶ 235. Therefore, Tech's claim that it provided

sufficient policies, training, and procedures to address gender bullying students and related suicide risk is without merit.

Indeed, a review of Adreya's prior school's policies – Defendant Wyoming Valley School District – shows how important adoption of an Act 71 suicide policy was for protecting Adreya from gender based bullying and related suicide risk.

In the District's Act 71 policy, the District calls out bullying as a suicide risk factor, and points to resources on youth suicide awareness and prevention programs, as is required by 24 PS § 15-1526(c)(7):

> **SUICIDE AWARENESS AND PREVENTION RESOURCES**
>
> A listing of resources regarding suicide awareness and prevention shall be attached to this policy.
>
> References:
>
> School Code – 24 P.S. Sec. 1526

PSOMF Exhibit D at 7. One of the resources provided in the District's policy is a link to the American Foundation for Suicide Prevention's model policy, which speaks to the suicide risk Adreya faced as a transgender youth:

> **School Policy**
>
> **Model School Policy on Suicide Prevention –**
> https://www.afsp.org/content/download/10555/186750/file/Model%20Policy_FINAL.pdf
>
> Written by American Foundation for Suicide Prevention, National Association of School Psychologists, American School Counselor Association, and The Trevor Project. This modular, adaptable document will help educators and school administrators implement comprehensive suicide prevention policies in communities nationwide.

> **LGBTQ (Lesbian, Gay, Bisexual, Transgender, Queer or Questioning) Youth**
>
> The CDC finds that LGB youth are 4.5 times more likely, and questioning youth are over twice as likely to consider attempting suicide as their heterosexual peers.[17]  One study found that 40 percent of transgender people attempted suicide sometime in their lifetime – of those who attempted, 73 percent made their first attempt before the age of 18.[18] Suicidal behavior among LGBTQ youth can be related to experiences of discrimination, family rejection, harassment, bullying, violence, and victimization. For those youth with baseline risk for suicide (especially those with a mental health condition), these experiences can place them at increased risk. It is not their sexual orientation or gender identity that place LGBTQ youth at greater risk of suicidal behavior, but rather these societal and external factors: the way they are treated, shunned, abused, or neglected, in concert with other individual factors such as mental health history.
>
> **Model School District Policy on Suicide Prevention | Model Language, Commentary, and Resources    19**

PSOMF Exhibit D at 8; Exhibit E at 19.

The District's policy also links to The Trevor Project, described by Wyoming Valley as "the leading national organization providing crisis intervention and suicide prevention services to lesbian, gay, bisexual, transgender, and questioning youth." PSOMF at ¶ 233. Per The Trevor Project, and consistent with the American Foundation for Suicide Prevention's data:

> • LGBTQ+ young people are **more than four times as likely** to attempt suicide than their peers (Johns et al., 2019; Johns et al., 2020).

Id. at ¶ 234.

As shown, then, an Act 71 compliant suicide policy could have saved Adreya by directly addressing: (1) Adreya's general suicide risk as a trans youth; (2) caused a referral to a suicide prevention coordinator for early intervention.

Had Tech adopted a legally compliant Act 71 policy like the Wyoming Valley School District, Tech could have recognized Adreya as at suicide risk and provided

"an emotional or mental health safety plan", Exhibit D at 4, as Adreya met the

definition in the District's policy for a student at risk of suicide:

> Early identification of individuals with one (1) or more suicidal risk factors or of individuals exhibiting warning signs, is crucial to the district's suicide prevention efforts. To promote awareness, district employees, students and parents/guardians should be educated about suicidal risk factors and warning signs.
>
> **Risk factors** refer to personal or environmental characteristics that are associated with suicide including, but not limited to:

> - Bullying (victim or perpetrator).
> - School or work issues.
> - Physical, sexual or psychological abuse.

> Any district employee who has identified a student with one (1) or more risk factors or who has an indication that a student may be contemplating suicide, shall refer the student for further assessment and intervention.

PSOMF Exhibit D at 3-4.

The District's Act 71 complaint policy then provides a variety of interventions

a school can use, including "suicide assessment instrument … by trained mental

health staff," notification to parents/guardians, "identif[ication] [of] mental health

service providers to whom students can be referred," and creation of an "emotional

or mental health safety plan." PSOMF Exhibit D at 5.

Of course, Tech did none of this for Adreya, who had multiple suicide risk

factors, some of which were constitutionally protected.

So, after attending Wyoming Valley School District for years, Adreya lasted only days after she transferred to Tech – a school that lacked the policies and concomitant resources regarding gender-based bullying and suicide.

As this Court previously noted here, "[a] plaintiff pressing a §1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." Harden v. West Side Career & Tech. Ctr., 2024 U.S. Dist. LEXIS 136992, *25 (M.D. Pa. August 2, 2024).

Here, Plaintiff has done so.  Plaintiff has readily identified several items of "specific training" that Tech failed to provide which has a "casual nexus" with Adreya's constitutional deprivations and resultant suicide:

- Rava did not know how to apply Tech's policies on unconstitutional gender-based discrimination and thus failed to do so.  Rava put treated William's discrimination of Adreya as simply bullying, and then put Adreya at risk or further discrimination by her tormentor, T.W., while Rava also deprived Adreya of resources that could have stopped her suicide; and,

- Tech failed to train on suicide prevention in violation of Pennsylvania law.[2]  While this was a violation of state law, not federal law, an Act 71 compliant suicide policy like Wyoming Valley School Districts would

---

[2] Plaintiff acknowledges that violation of state law is not generally the basis for a Section 1983 claim.  See Galen v. County of Los Angeles, 477 F.3d 652, 662 (9th Cir. 2007). However, "when a violation of state law causes the deprivation of a right protected by the United States Constitution, that violation may form the basis for a Section 1983 action." Lovell by & Through Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 370 (9th Cir. 1996).

have addressed the risk of unconstitutional gender-based discrimination and its relationship to suicide. As stated, "[t]he Equal Protection Clause does confer a constitutional right to be free from sex discrimination." S.K. v. N. Allegheny Sch. Dist., 168 F. Supp. 3d 786, 812 (W.D. Pa. 2016). Thus, by failing to adopt an Act 71 suicide policy, Tech violated the equal protection clause, leading to Adreya's suicide.

In sum, this Court should deny Tech and Rava's Motion as to Plaintiff's failure to train claims.

### (c) Defendants exhibited deliberate indifference to T.W.'s bullying of Adreya.

Tech and Rava argue Plaintiff has not shown deliberate indifference sufficient to sustain Plaintiff's failure to train claims. As an initial matter, failure to train claims can proceed on a theory that the need for training is "so obvious that failure to do so could properly be characterized as deliberate indifference to constitutional rights[.]" City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989). Moreover, case law is clear that a government entity's failure to establish policies to prevent violations of constitutional rights can establish deliberate indifference. Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 585 (3d Cir. 2003).

First, there is no evidence Rava was trained in identifying and responding to instances of student-to-student discrimination. Despite this, Rava was tasked with fielding Mr. Pieczynski's referral regarding T.W.' discrimination against Adreya and applying the appropriate Tech policy to T.W.' behavior.

But as discussed, Rava classified the incident as "bullying-like" behavior, contrary to Pieczynski's calling it "harassment of a fellow student [based on] sexual orientation."

| Referral Issued by: Pieczynski, Tom | | | |
|---|---|---|---|
| **Incident** | **Date/Time** | **Description** | **Details** |
| Failure to Follow school policy<br>Student Code of Conduct<br>On school property/grounds | 09/29/2021 10:43AM | L59. Failure to Follow school policy;<br>Harassment of a fellow student sexual orientation | Harassment of a fellow student sexual orientation by intimidation and disrespect of the students name ▮▮▮▮ is becoming increasingly confrontational and disruptive to other students learning environment. Call home will be made |
| **Action Type** | **Date/Tot. Days** | **Description** | **Details** |
| In-school suspension | 09/30/2021-<br>10/04/2021 / 3.00 | ISS | |

Rava then permitted T.W. to return to class to continue his discrimination against Adreya. Thus, Rava utterly failed to identify and respond to discriminatory harassment though his own staff tried to alert him.

Accordingly, Tech's failure to properly train Rava in responding to discrimination, despite the obvious need to train teachers and administrators on same, was "deliberate indifference."

Nor is Rava's conduct in handling T.W. the only evidence of deliberate indifference. As described above, Pennsylvania mandated that schools such as Tech adopt suicide prevention policies by the 2015-2016 school year.

Clearly, the need for training and policies regarding student suicide was obvious. Even without this mandate, though, case law is clear that training on the intersection between bullying and student suicide is obvious. See, e.g., Tumminello v. Father Ryan High School, Inc., 678 Fed.Appx. 281, 288 (6th Cir. 2017) ("If a

school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of the bullying might resort to self-harm, even suicide.").

Tech, however, failed to do adopt a suicide policy for over six (6) years after Pennsylvania mandated Tech do so. Its failure to do clearly show deliberate indifference to the risks posed by unconstitutional gender-based harassment.

**(d)  Causation**

Tech and Rava argue Plaintiff's § 1983 failure to train claims must fail because Plaintiff cannot demonstrate that Adreya would not have committed suicide had Tech appropriately trained its teachers and administrators on discrimination and student suicide.

Tech and Rava's arguments as to causation are misguided on two fronts.

First, Tech and Rava argue "[t]he record identifies a variety of factors that could have contributed to Decedent's death, but none of them can be attributed to the Tech Defendants." Br. at 23. As Tech and Rava have no authority or expertise to make this statement.

Indeed, Plaintiff could assert with equal authority the cause of Adreya's suicide: Adreya's attendance at a school where her bully was permitted to continue bullying her, where the school administration steadfastly refused to adopt a suicide prevention policy despite being mandated by law to do so.

This Court cannot determine based on the conjecture of whether Tech or Rava did or did not cause Adreya's suicide as a matter of law.  Rather, the Court must take the reasonable inference in Plaintiff's favor that Adreya's suicide was caused by discrimination at this juncture.

Second, the Defendants' causation argument relies heavily on dicta in <u>Sanford v. Stiles</u>, a case in which the Third Circuit held that a school's student suicide procedures did not cause a student's suicide. 456 F.3d 298, 314 (3d Cir. 2006).

However, <u>Sanford</u> was decided in 2006, eight years before Pennsylvania mandated that schools adopt suicide policies in 2015. There can be no comparison, then, between an school district's experience of student suicides in 2006 and the tragic reality that student suicide has greatly increased, so much so it compelled the Pennsylvania to mandate suicide policies.

Indeed, as the Sixth Circuit noted in 2017, eleven years after <u>Sanford</u>:

> Our newspapers and television networks consistently report instances when young people harm themselves . . . Such occurrences may not be common within an individual school, but because reports of these tragedies are consistent and well publicized, **all school districts should realize that self-harm is a reasonably foreseeable result of bullying, without requiring specific evidence of the victim's mental state**. If a school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of the bullying might resort to self-harm, even suicide.

Tumminello v. Father Ryan High Sch., Inc., 678 F. Appx. 281, 288 (6th Cir.) (cited by this Court in Harden v. West Side Career & Tech. Ctr., 2024 U.S. Dist. LEXIS 136992 (M.D. Pa. August 2, 2024)) (emphasis added).

Other courts have concluded similarly. In Meyers v. Cincinnati Bd. of Educ., the plaintiff alleged school administrators knew decedent was bullied at school, that a risk of bullying is suicide, and failed to take reasonable steps to protect decedent from that risk. 983 F.3d 873, 885 (6th Cir. 2020). The district court concluded this was enough to subject the school administration to civil rights liability. Id. See also Galloway v. Chesapeake Union Exempted Vill. Sch. Bd. of Educ., 2012 WL 5268946, at *5–7 (S.D. Ohio Oct. 23, 2012) (same); Mohat v. Horvath, 11th Dist. Lake No. 2013-L-009, 2013-Ohio-4290, 2013 WL 5450296 (Sep. 30, 2013) (same); Elsharkawy v. Chisago Lakes Sch. Dist. Bd. of Educ., 0:20-cv-1971-DSD, 2021 U.S. Dist. LEXIS 143780, 2021 WL 3293627, at *4 (D. Minn. Aug. 2, 2021) (same).

Nor can a comparison be drawn between a school's poor implementation of its suicide policies, as in Sanford, and Tech's complete failure to adopt a suicide policy. Moreover, Sanford does not deal with allegations that an administrator's violations of a student's constitutional rights, paired with the school district's blatant disregard in adopting a suicide policy, led to the student's suicide. Therefore, Defendants' reliance on Sanford is misguided, and their argument as to causation must be rejected.

**II.    Defendant Rava is not entitled to judgment as a matter of law under the doctrine of qualified immunity as he violated Plaintiff's right to equal protection.**

Rava argues that he is entitled to qualified immunity. He is not, and the Court should deny Rava's Motion on this basis.

Qualified immunity "shields governmental officials from suit and from liability if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mack v. Yost, 63 F.4th 211, 221 (3d Cir. 2023).

The analysis of qualified immunity is guided by a two-part test: (1) "whether the facts . . . show the violation of a legal right," and (2) "whether that right was clearly established." Id. at 227. For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)

Beginning with the second prong of the qualified immunity analysis, it is unquestionable that the right of student to be free from discrimination on the basis of sex is clearly established. Doe v. Del. State Univ., 2022 U.S. Dist. LEXIS 36633, at *16 (D. Del. Mar. 2, 2022) ("It cannot be seriously disputed that, at the time of Defendant Young's alleged conduct, the law was sufficiently clear that, in the public education context, students have an equal protection right to be free

from purposeful discrimination and selective enforcement of school policies based on their sex and race/national origin. Indeed, well prior to the events of this case, the Equal Protection Clause was interpreted to prohibit any purposeful discrimination directed at an individual by state actors solely because of the individual's membership in a protected class."), citing Doe v. Miami Univ., 882 F.3d 579, 604 (6th Cir. 2018); see also Oona R.-S.- by Kate S. v. McCaffrey, 143 F.3d 473, 476 (9th Cir. 1998) ("[T]he right to be free from intentional gender discrimination by a state actor was clearly established as early as 1988.")

As to the first prong, the record in this matter clearly establishes that Rava violated Adreya's right to be free from discrimination on the basis of her sex. As explained more thoroughly above, Adreya was brutally bullied by T.W. based on Adreya's sex, T.W. was kicked out of class by Mr. Pieczynski, and Rava let T.W. return to class with Adreya where he was free to continue harassing Adreya unabated.

Accordingly, Rava violated Adreya's constitutional right to be free from sex-based discrimination. See, e.g., Howard v. Bd. of Educ., 893 F. Supp. 808. 818-19 (N.D. Ill. 1995) ("Given the clearly established law surrounding sexual harassment in the workplace, combined with the unique role a principal plays in the administration of a public school, the court considers it to be objectively unreasonable to believe that a principal who intentionally permits students to

sexually harass a teacher after the teacher voices complaints does not violate equal protection.").

Further, it is sufficiently clear that a reasonable official would understand that permitting a student who had just been removed from class for discriminating against another student to return to class with his victim would result in further violation of the victims' rights. <u>Nicole M. v. Martinez Unified Sch. Dist.</u>, 964 F. Supp. 1369, 1383 (N.D. Cal. 1997) ("Particularly in the context of sexual harassment, [a principal's] alleged failure to act is significant because it may constitute evidence of her intent to discriminate on the basis of sex.") (alteration added)

Defendants further argue that "for an equal protection claim, a plaintiff must prove intentional discrimination, and the record does not support the same." Br. at 30. This is a misstatement of the law.

To state a claim for individual liability under the Equal Protection Clause based on peer-to-peer harassment, a plaintiff must allege that she "was subjected to the discriminatory peer harassment." <u>Feminist Majority Found. v. Hurley</u>, 911 F.3d 674, 702 (4th Cir. 2018) (citing <u>Stiles ex rel. D.S. v. Grainger Cty.</u>, 819 F.3d 834, 852 (6th Cir. 2016)); <u>see also</u> <u>Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.</u>, 587 F.3d 176, 196 (3d Cir. 2009).

Additionally, a plaintiff must allege that the school official "responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly

unreasonable in light of known circumstances." <u>Feminist Majority Found.</u>, 911 F.3d at 702 (<u>citing</u> <u>Stiles ex rel.</u> *D.S.*, 819 F.3d at 852); <u>see also</u> <u>Flores v. Morgan Hill Unified Sch. Dist.</u>, 324 F.3d 1130, 1135 (9th Cir. 2003).

In other words, the plaintiff must allege that the school administrator knew about harassment of the plaintiff "and acquiesced in that conduct by refusing to reasonably respond to it." <u>Murrell v. Sch. Dist. No. 1, Denver, Colo.</u>, 186 F.3d 1238, 1250 (10th Cir. 1999); <u>see</u> <u>also</u> Hill v. Cundiff, 797 F.3d 948, 978 (11th Cir. 2015)

As demonstrated above, Adreya was unquestionably subjected to discriminatory peer harassment. Further, Rava's response to this harassment—to release T.W. back into class to continue to harass Adreya—was clearly unreasonable.

In fact, when asked whether he would have permitted T.W. to return to class with Adreya, Dr. Thomas Duffy—Chief School Administrator and Compliance Officer at Tech in 2021—responded <u>"[b]ased on everything I know now sitting here looking back, absolutely not."</u> PSOMF at ¶ 257.

Defendants counter that T.W. was eventually suspended for his treatment of Adreya. However, Defendants have cited no case law indicating that an administrator eventually responding appropriately to discriminatory peer harassment precludes liability for prior inappropriate responses. And in this case, it was too late to stop the harm to Adreya and her eventual suicide.

Nor is Rava's decision to permit T.W. to return to class his only unreasonable response. As described above, Tech has two very different policies: one for run-of-the-mill bullying and another for discriminatory bullying. Despite T.W.' treatment of Adreya clearly implicating the discriminatory bullying policy, and despite Adreya's teacher referring the incident to Rava as an act of discrimination, Rava treated it as a typical "bullying-like" incident.

Rava's clearly wrong response meant that Adreya was afforded none of the resources offered to students subjected to discrimination. This, too, is clearly unreasonable, especially considering the severity of the discrimination described by Pieczynski. Therefore, Plaintiff adequately states a claim for individual liability under the Equal Protection Clause.

### *REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

## **CONCLUSION**

Based on the foregoing, Defendant West Side Career and Technology Center and Defendant Richard Rava are not entitled to judgment as a matter of law on Counts V and IX.


Dated: January 29, 2025            */s/ Ryan P. Dickinson*
                                   Ryan P. Dickinson, Esq. (PA #332378)
                                   ryan@vca.law
                                   Nathaniel L. Foote, Esq. (PA #318998)
                                   nate@vca.law
                                   Andreozzi + Foote
                                   4503 North Front Street
                                   Harrisburg, PA 17110
                                   Ph: 717.525.9124 | Fax: 717.525.9143
                                   *Attorneys for Plaintiffs*

## <u>CERTIFICATION OF WORD COUNT</u>

      In accordance with Local Rule 7.8, while this brief exceeds fifteen (15) pages, the word count of this brief is 5,178.

Dated: January 29, 2025                    */s/ Ryan P. Dickinson*
                                         Ryan P. Dickinson, Esq.
                                         Attorney for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned attorney for Plaintiff hereby certifies that a true and correct copy of the foregoing document has been electronically filed and is available for viewing and downloading from the ECF system in accordance with the local Federal Rules of Civil Procedure and has been served electronically upon the following counsel of record on this day addressed as follows:

Alyssa M. Hicks
ahicks@kingspry.com
John E Freund, III
jef@kingspry.com
King Spry Herman Freund & Faul, LLC
One West Broad Street
Bethlehem, PA 18018

Dated: January 29, 2025                    _/s/ Ryan P. Dickinson_____
                                           Ryan P. Dickinson, Esq.