## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SA'RAYA HARDEN, | : | CIV. NO. 3:23-CV-01631 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| WEST SIDE CAREER AND | : | |
| TECHNOLOGY CENTER, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

### I. Introduction.

This case is rooted in the death of Adreya Harden ("Adreya") at the age of 15. Adreya died by suicide on October 5, 2021. Shortly before her death, Adreya faced bullying at school because she was transgender. Adreya's mother, Saraya Harden ("Harden"), now brings § 1983 claims against Adreya's school, school district, and principal. All parties are in agreement that Adreya's death is a tragedy. *See doc. 39* at 10 ("The Tech Defendants first want to recognize the tragedy before the Court. The weight of student suicide is crippling to all parties and cannot be overlooked."); *see also doc. 40* at 9 (same). The parties do not agree, however, whether the defendants violated Adreya's constitutional rights and thereby caused her suicide. Thus, currently pending is the defendants' motion for

summary judgment. For the reasons that follow, we will grant in part and deny in part the motion for summary judgment.

## II. Background and Procedural History.

Harden initiated this action by filing a complaint on October 2, 2023. *Doc. 1*. Harden filed the complaint as Adreya's mother and the administrator of Adreya's estate. *Doc. 1* ¶ 16. In the complaint, Harden named 13 defendants, including 10 Doe defendants which were later dismissed by the parties' stipulation. *See docs. 1, 34*. The three remaining defendants are: (1) Wyoming Valley School District ("School District"); (2) West Side Career and Technology Center ("Tech"); and (3) Richard Rava, the Principal of Tech ("Principal Rava"). *Doc. 1*.

The complaint brings claims against the defendants under Title IX, 42 U.S.C. § 1983, and state law. *Doc. 1*. The defendants filed a partial motion to dismiss, which we granted in part and denied in part. *Docs. 8, 25, 26*. The parties also entered into stipulations regarding the dismissal of certain claims. *Docs. 29, 34*. Accordingly, when the motion for summary judgment was filed the following claims remained: (1) § 1983 claims for failure to train against Tech (Count V), Principal Rava (Count V), and the School District (Count VI); and (2) § 1983 claims for sex-based discrimination in violation of the equal protection clause

against Tech (Count VII), the School District (Count VIII), and Principal Rava (Count IX). *See docs. 1, 26, 29, 34*.

The parties consented to our jurisdiction pursuant to 28 U.S.C. § 636(c) on February 21, 2024. *Doc. 18*. Although we issued a case management order on March 27, 2024, the parties later jointly filed a motion to bifurcate discovery (*doc. 28*), which we granted (*doc. 30*). Accordingly, the parties conducted discovery limited only to the issue of liability, with fact discovery to close on or before October 30, 2024, and dispositive motions and briefs in support thereof due on or before December 2, 2024. *Doc. 30*.

The defendants filed a single motion for summary judgment. *Doc. 35*. Tech and Principal Rava jointly filed a brief in support thereof (*doc. 39*) and the School District filed its own brief in support (*doc. 40*). Tech and Principal Rava jointly filed a statement of material facts, and the School District filed an identical statement of material facts. *Docs. 39-1, 40-1*. Harden filed a single brief in opposition (*doc. 50*) and a counterstatement of material facts (*doc. 49*). Tech and Principal Rava filed a reply brief. *Doc. 51*. The motion for summary judgment is thus ripe for review.

3

### III.  Summary Judgment Standards.

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the

4

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial, summary judgment is appropriate." *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary

basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex,* 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up'

6

time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV. Material Facts.

The following facts are the material facts for purposes of the pending summary judgment motion.[1]

---

[1] Here, in accordance with Local Rule 56.1, the defendants each filed a statement of material facts which are identical. *Docs. 39-1, 40-1.* For readability, we will cite to the first-filed statement of material facts, *doc. 39-1.* Also in accordance with Local Rule 56.1, Harden filed a counterstatement of material facts. *Doc. 49.* Where the facts are undisputed, we cite to the defendants' statement of material facts, *doc. 39-1.* In accordance with our duty to "construe all facts and inferences in favor of the nonmoving party[,]" *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 419 (3d Cir. 2015)), however, where Harden disputes a fact set forth in the defendants' statement of material facts and she cites to record evidence creating a genuine factual dispute, we cite to Harden's version of the fact. At the end of her counterstatement of material facts, Harden includes 31 paragraphs which she titles "Plaintiff's Supplemental Statement of Material Facts[.]" *Doc. 49* at 15–19. The defendants do not dispute these statements. *See docket generally*; *see also doc. 51.* Thus, where these statements of fact are supported by the record, we cite to them.

When citing to page numbers of a document, we use the page numbers from the CM/ECF header on the top of the document.

**A.  Adreya's Early Life and Time at the School District.**

Adreya's father passed away when she was four years old, and she "began to have behavioral issues around" that time. *Doc. 39-1* ¶¶ 170, 172.  During a doctor's appointment that Harden took Adreya to, the doctor noted:

> Going on for a long time, a lot of behavioral issues, does not listen. . . . Mom wants to start him on something because the situation is causing the whole family a lot of stress.

*Id.* ¶ 171.  It was also at or around the age of four that Adreya was first medicated for Attention Deficit Hyperactivity Disorder. *Id.* ¶ 173.

"[Adreya] continued to have behavioral issues and various medication changes through the age of [14]." *Id.* ¶ 174.  At the age of 10, she was diagnosed with, and began medication for, bipolar disorder. *Id.* ¶ 175.  And "[a]t some point she was also diagnosed with depression and anxiety." *Id.* ¶ 176.

Adreya began at the School District in kindergarten. *Doc. 39-1* ¶ 6. According to Harden, Adreya's "troubles at school began at a young age because her 'nerves were very shot.'" *Id.* ¶ 7.  Adreya also "struggled with bullying throughout elementary school[,]" although this was never reported to the School District. *Id.* ¶ 8.  While still in elementary school, Adreya "displayed school refusal behaviors[,]" specifically she would "cry, kick, and scream because she did not want to go to school." *Id.* ¶¶ 9, 10.

For the 2017–2018 school year, Adreya was in fifth grade at the School District. *Cf id.* ¶ 11. Adreya was also a patient of the Office of Psychiatry and Counseling Services of Matthew Berger, "where she received medication checks by Michelle Baker, PA-C" ("PA Baker"). *Id.* ¶ 177. On November 16, 2017, Harden told PA Baker "that [Adreya] was making suicidal statements." *Id.* ¶ 178. Harden did not inform the School District or Tech about these statements. *Id.* ¶ 179. Approximately one month later, on December 14, 2017, Harden reported to PA Baker that "[Adreya] is no longer stating she wants to die." *Id.* ¶ 180. Approximately five months after that, on May 9, 2018, Harden reported to PA Baker "that [Adreya] threatened to cut herself and that she recently smashed a 5[-]gallon fish tank." *Id.* ¶ 181. Again, Harden did not report this to the School District or Tech. *Id.* ¶ 182. In May 2018, Harden also reported to PA Baker that "[Adreya] had an increase in behavioral issues/mood swings when she did not take her medication." *Id.* ¶ 183; *see also doc. 39-4* at 63. "During this time, [Harden] suffered from her own mental health issues." *Doc. 39-1* ¶ 184. "It is believed [Harden] first unilaterally weened [Adreya] off her medication sometime around October 2018 when [Adreya] was . . . []12[] years old." *Id.* ¶ 189.

Nevertheless, Adreya "did not struggle" when she entered sixth grade for the 2018–2019 school year, transitioning from elementary school to middle school. *Id.* ¶ 11. Shawn Kelly ("Kelly") was assigned as Adreya's guidance counselor in sixth

grade. *Id.* ¶ 12.  "Kelly has been a School District guidance counselor for . . . []18[]

years." *Id.* ¶ 13.  He continued to serve as Adreya's guidance counselor through at

least eighth grade. *Cf id.* ¶¶ 32, 34, 45,

In sixth grade, Adreya began "'changing' in that she started dressing

differently." *Id.* ¶ 15.  According to Harden, Adreya "did not have any issues

dressing as herself when she went in person." *Id.* ¶ 16.  She also came out as gay at

"sometime during [her] sixth grade year[,]" but she did not yet "identify as

transgender." *Id.* ¶ 25.  Adreya was not "out" as gay to her classmates, though, and

"there is no record of this status in her educational records." *Id.* ¶ 26.

Nevertheless, Adreya "stopped attending school in person in" February

2019, when she was still in sixth grade, "because she was being bullied[.]" *Id.*

¶¶ 14, 17.  Adreya never "reported details of the" bullying to Harden. *Id.* ¶ 14.  On

February 5, 2019, Adreya told PA Baker that "she was tired of everyone trying to

get her in trouble and trying to fight with everyone" and that "peers tease her and

get under her skin." *Id.* ¶ 185.  Adreya's therapist wrote a note to the school, dated

February 5, 2019, which stated:

> The above-named patient is currently under my care for a
> medical condition.  I am recommending that [s]he receive
> homebound instruction for the next three months, at which time
> [s]he will be reevaluated.

*Id.* ¶ 18 (alteration in original); *see also id.* ¶ 186.  The note refers to "homebound

instruction" which is a temporary program for "students with a medical issue

precluding them from attending school in person" in which "School District teachers meet with students one-on-one outside of school." *Id.* ¶¶ 19–21. The note "did not reference issues with bullying." *Id.*

While in the homebound instruction program, Adreya met with a "teacher at the local library approximately three . . . days a week for approximately two hours." *Id.* ¶ 23. Harden does not know "what [Adreya] would do during the day" when not with the teacher because Harden was at work. *Id.* ¶ 24. Adreya "only interacted with children in her neighborhood" while receiving homebound instruction. *Id.* ¶ 27.

On March 11, 2019, Harden informed PA Baker that "[Adreya] was doing very well with [h]omebound [instruction]." *Id.* ¶ 187. But on July 18, 2019, Harden told PA Baker that "[Adreya's] anger and bipolar were really bad." *Id.* ¶ 188. Around this time, when Adreya was 13 years old, "[Harden] put [Adreya] back on medication[.]" *Id.* ¶ 190. But "[o]n August 22, 2019, Plaintiff reported to [PA Baker] that [Adreya] does not want to live with her anymore and wants to go to foster care." *Id.* ¶ 191. "That same day, [Harden] took [Adreya] to the hospital due to a violent outburst." *Id.* ¶ 192. "[Harden] reported to the ER doctor that [Adreya] was having violent outbursts at home, she stole her grandmother's credit card and bought goods online, and that [Harden] thinks [Adreya] killed her guinea pig." *Id.* ¶ 193. "The ER doctor reported under 'History of Present Illness': 'The

11

patient presents with psychiatric problem and agitation.  The onset is chronic.

Character of symptoms agitated suicidal thoughts.   The degree of symptoms is

minimal.'" *Id.* ¶ 194.  "Later in the report, however, it does note that [Adreya] was

not suicidal at that time." *Id.* ¶ 195.

"Starting in at least August of 2019, [Adreya] attended therapy at Children

Services Center." *Id.* ¶ 196.  "During one of these sessions, [Adreya] reported she

had been molested approximately three years" before, when she was around the

age of 10 "by a . . . []16[] year old neighbor" who "touched [Adreya's] genitals and

then showed her gay porn." *Id.* ¶¶ 197–98.  "[Harden] believes this affected

[Adreya's] mental health." *Id.* ¶¶ 199.  "[Adreya] also experienced significant grief

after her paternal grandfather passed away."[2] *Id.* ¶ 200.  "[Harden] reported to

Children Services Center that [Adreya] was in homeschool because she kept

fighting with peers." *Id.* ¶ 202.

Adreya continued in the homebound instruction program in seventh grade,

the 2019–2020 school year. *Id.* ¶ 28.  Adreya's time in the homebound instruction

program ended only when "school closed due to the COVID-19 pandemic in

March of 2020." *Id.* ¶ 28.  For the remainder of seventh grade, Adreya participated

in school through Google Classroom and "had no issues with accessing virtual

---

[2] "The record also indicates that [Adreya's] father was potentially murdered
by his father." *Id.* ¶ 201.

learning[.]" *Id.* ¶ 29.  At the end of the 2019–2020 school year, "sometime around June 2020[,]" "[Harden] unilaterally weened [Adreya] off her bipolar and depression medications[.]"

Adreya started eighth grade in the 2020–2021 school year. *Id.* ¶ 30. "Somewhere around September 11, 2020, [Adreya] began her medical transition from male to female[,]" and on October 16, 2020, "[Adreya] received her first hormonal injection." *Id.* ¶¶ 204–05.  In September of her eighth-grade year, Harden "notified the School District, via . . . Kelly," Adreya's guidance counselor, "that [Adreya] identifies as transgender and wishes to go by the name Adreya and she/her pronouns." *Id.*  "Mr. Kelly notified [Adreya's] teachers of her preferred name and pronouns and requested they respect the same 'to help her feel comfortable engaging with school.'" *Id.* ¶ 32.

But Harden "complained to the School District that [Adreya] did not feel comfortable accessing her Google Classroom because it displayed her 'dead name[,]'" in other words, her birth name or, at the time, legal name. *Id.* ¶ 33.  So "Kelly messaged the School District's IT department and learned that because Google Classroom is based on its Skyward system, which is the School District's school data system, the same reflects all students' legal names." *Id.* ¶ 34. Furthermore, the School District advised Harden, "they could not legally change Decedent's name in the system without a court order confirming a legal name

change." *Id.* ¶ 35.  According to Harden, Adreya "would not do any of her work on the virtual learning platform because the School District would not change her legal name to her preferred name on Google Classroom." *Id.* ¶ 31.

Although Adreya's dead name appeared on the Google Classroom system, "it is the School District's practice to refer to its students by their preferred names." *Id.* ¶ 36.  And "[t]he School District is not aware of any incidents where its staff referred to [Harden] by her 'dead name,' or referred to her as male." *Id.* ¶ 38.  Further, although Harden "first testified that [Adreya] advised her that School District teachers were referring to [Adreya] by her birth name[,]" Harden "then clarified that the same did not occur because she 'was not in school at all that year.'" *Id.* ¶ 37.

Because Adreya "did not feel comfortable accessing the virtual learning program with her legal name listed," Harden and the School District agreed on an accommodation: the School District would "provide [Harden] with schoolwork for [Adreya] to complete at home." *Id.* ¶¶ 39, 40.  The schoolwork to be completed at home ("packet work") "included a week's worth of work." *Id.* ¶ 44.  Furthermore, the School District "excused [Adreya's] absences from the start of the school year until the plan for packet work was finalized" and referred Harden to a School District social worker "to see if he could assist [Harden] with obtaining a name change for [Adreya]." *Id.* ¶¶ 41, 42.

Adreya, however, "did not complete any packet work because she was overwhelmed." *Id.* ¶ 43. "On or around[] December 14, 2020, . . . Kelly emailed the School District's social worker and attendance officer due to his concerns that [Adreya] was not completing any work and asked for ideas." *Id.* ¶ 45. "Efforts were made to contact [Harden] to provide academic support for [Adreya,] but [Harden] did not respond." *Id.* ¶ 46. "Despite the attempts to accommodate [Adreya], she missed an entire year of school[,]" all of her eighth grade year. *Id.* ¶ 47. "[Adreya] did not speak to any School District teachers or students in a school setting for the 2020–2021 school year." *Id.* ¶ 48. "The School District confirmed that students did not communicate with one another in Google Classroom." *Id.* ¶ 50. "The School District had no knowledge of students or teachers misgendering [Adreya]." *Id.* ¶ 49.

"As of August 26, 2021," the summer after Adreya's eighth-grade year, "[Adreya] started taking some medications again as [Harden] notified a doctor at Pediatric Associates of Kingston, LLC, that [Adreya] sometimes misses her bipolar medication PM dose and stopped taking her depression medication." *Id.* ¶ 206.

For her ninth-grade year, academic year 2021–2022, Adreya did not attend school at a School District school "and instead withdrew to transfer to Tech effective September 22, 2021." *Id.* ¶ 51; *see also id.* ¶ 63.

15

### B. Adreya's Time at Tech.

"Tech is an educational facility that specializes in providing high school aged students with vocational education." *Id.* ¶ 64.  Tech serves five school districts ("the sending school districts") including the School District. *Id.* ¶ 65. "Students from the sending school districts complete an application process, which is typically orchestrated through guidance counselors." *Id.* ¶ 66.  Tech provides academic instruction and instruction in 15 different technical programs, and the students "have the option of participating part time or full time." *Id.* ¶¶ 67, 68.

"[Adreya] was familiar with Tech because her cousin went there." *Id.* ¶ 72. "Sometime after the start of the school year in September of 2021, [Adreya] approached [Harden] and asked if she could attend school at Tech." *Id.* ¶ 71. "Harden reached out to Tech to enroll [Adreya] and had a meeting with the guidance counselor, Jerry Ogurkis" ("Ogurkis"). *Id.* ¶ 73.  "Ogurkis has worked at Tech as the guidance counselor for . . . []27[] years." *Id.* ¶ 80.

"Tech was not made aware of any mental health concerns for [Adreya]" at this meeting with Ogurkis or any other time. *Id.* ¶ 133.  But during the meeting between Harden, Adreya, and Ogurkis, Harden told Ogurkis that Adreya "identifies as a transgender female and goes by she/her pronouns." *Id.* ¶ 74. Ogurkis told Harden and Adreya that there were approximately 12 other transgender students at Tech and that "there are designated safe spaces throughout

the school."[3] *Id.* ¶ 75.  Harden asked Ogurkis whether Tech was supportive of the LGBTQIA+ community, and Ogurkis responded that "Tech has a very welcoming school atmosphere with virtually no problems with students." *Id.* ¶ 79.  Because Ogurkis could tell that Harden and Adreya were nervous during their meeting, Ogurkis "gave them a tour of the building and answered questions to alleviate concerns." *Id.* ¶ 81.  Harden and Adreya "asked . . . Ogurkis questions about documenting a student's chosen name, and he explained how that is honored[,]" specifically that "Tech enters a student's preferred name into its system next to their legal name, which is accessible to all Tech teachers."[4] *Id.* ¶¶ 82, 83.

Nevertheless, "[Harden] testified that after the meeting she felt that [Adreya] would not fit in because she would be the only transgender student—although this was not the case—and that the cosmetology program was full." *Id.* ¶ 85.  In reality, Adreya "could not enroll in cosmetology because she did not qualify at that time" pursuant to Pennsylvania law and Tech policy which permits admission to the cosmetology program for sophomore, junior, and senior students only. *Id.* ¶¶ 86,

---

[3] Adreya's teacher, Thomas Pieczynski, later "confirmed that there were other transgender students at Tech" and that he is "unaware of the other transgender students being bullied on the basis of sex." *Id.*

[4] Adreya's teacher, Thomas Pieczynski, and Principal Rava "also confirmed that Tech honors students' preferred names." *Id.* ¶ 84.

87.  "The application to Tech stated that the cosmetology program is" not for freshmen. *Id.* ¶ 88.

Because [Adreya] was ineligible for cosmetology, [she] enrolled in the food marketing program[.]" *Id.* ¶ 90.  The food marketing program was taught by Thomas Pieczynski ("Pieczynski"), who "has been employed as a teacher at Tech for 18 years" and who Harden knew "because they grew up together." *Id.* ¶¶ 78, 89, 90.  Harden knew that Pieczynski has a child who identifies as transgender. *Id.* ¶ 92.  Harden spoke to Pieczynski only on the day she took Adreya to be enrolled at Tech. *Id.* ¶ 91.  "Pieczynski told [Harden] that all students at Tech are treated equally and have a fair opportunity to succeed." *Id.* ¶ 93.

During Harden and Adreya's visit to Tech prior to Adreya starting as a student, they did not meet with Principal Rava. *See id.* ¶ 94.  In fact, "[Harden] never met nor spoke to [Principal Rava]." *Id.*  Principal Rava thus "did not know [Adreya]" and "did not know that [she] was transgender" until he later received a discipline referral that referenced her. *Id.* ¶ 95.

"[Adreya] attended Tech in person for only four of eight school days." *Id.* ¶ 96.  "During that time, [Adreya] did not report any issues with her classes, her teachers, or other students" to anyone, including Ogurkis. *Id.* ¶¶ 97, 99.  Specifically, [Adreya] did not report any issues with her teachers or other students harassing her or referring to her as her 'dead name.'" *Id.* ¶ 98.  "[Harden] never

reported any concerns to Tech[,]" either. *Id.* ¶ 108.  In "[t]he days leading up to [Adreya's] death, she did not tell [Harden] there were any issues"; in fact, Adreya told "[Harden] [that] she made a friend and that she was happy." *Id.* ¶¶ 208–09. Other than "a single isolated incident[,]" which we will call "the name-calling incident" herein and describe in greater detail below, "no teacher reported issues to Tech administration that students or other teachers were harassing [Adreya]." *Id.* ¶ 106.  There were also no "behavioral concerns/discipline regarding [Adreya] during her short time at Tech." *Id.* ¶ 107.

That being said, during discovery for the instant case, "[Harden] produced a note from a student claiming she overheard a teacher refer to [Adreya] by her 'dead name.'" *Id.* ¶ 100.  Harden also "produced an email from another student [("the student who authored the email")] who knew [Adreya] from elementary school but did not recognize her when they were at Tech together." *Id.* ¶ 101. In the email, the student who authored the email "ma[k]e[s] various allegations about Tech that occurred after [Adreya's] suicide" and "recounts" the name-calling incident, which we will describe in greater depth below, "although she was not in th[e] class" in which that incident took place." *Id.* ¶¶ 102, 103, 104.  "[The student who authored the email] only talked to [Adreya] once while at Tech and implied that she did not know [Adreya] very well." *Id.* ¶ 102.  "[The student who authored the email] claims she knew that teachers would not call [Adreya] her preferred

name without insight as to how she knew since the same did not occur in their sole class together and this student only spoke to [Adreya] once." *Id.* ¶ 105.

The name-calling incident occurred on September 29, 2021, when "another student [("the offending student")] verbally harassed [Adreya] during . . . Pie[c]zynski's class."[5] *Id.* ¶ 110; *see also doc. 49* ¶ 240.  At first, Pieczynski "observed [Adreya] and the offending student talking in what appeared to be a flirtatious matter." *Id.* ¶ 111.  But "[l]ater on, the conversation took a turn and . . . Pieczynski observed [Adreya] and the offending student yelling at each other" with the offending student referring to Adreya by her dead name. *Id.* ¶¶ 112–13. "Pieczynski witnessed [the offending student] bullying Adreya for approximately 20 to 25 minutes"; "the bullying consisted of [the offending student] repeatedly calling Adreya by her 'dead name,' Andrew." *Doc. 49* ¶¶ 241–42.  Pieczynski later said of the bullying "that he had 'never seen that level of confrontation or aggressiveness from a student to particularly a, you know, transgender student." *Id.*

---

[5] The statement of material facts states: "There is a single incident wherein [Adreya] was the subject of sex-based harassment carried out by another student[.]" *Doc. 39-1* ¶ 109.  The counterstatement of material facts states that "[t]here is a genuine issue of material fact as to Defendants' characterization of a 'single incident.'  Thomas Pieczynski testified that he later learned through students of his that the student continued to bully Adreya throughout the remainder of the day following Pie[c]zynski removing the student from class." *Doc. 49* ¶ 109. The defendants do not argue that this statement would be inadmissible as hearsay or for any other reason.  Thus, because Harden cites to record evidence creating a genuine factual dispute (*see id.* (citing *doc. 39-10* at 12)), we will disregard the defendants' characterization of Adreya's bullying as a "single incident."

¶ 243. "Pieczynski asked the offending student to leave the class and reported this incident to Tech administration that day." *Id.* ¶ 114; *see also doc. 249* ¶¶ 244–45. In the referral to Principal Rava, "Pieczynski characterized the harassment as based on Adreya's sexual orientation." *Id.* ¶ 246. This was the only instance of Adreya being harassed by another student that Pieczynski witnessed and was the only instance he reported. *Id.* ¶¶ 115–16.

After receiving Pieczynski's discipline referral, Principal Rava "spoke with the offending student that same day."[6] *Id.* ¶¶ 117–18; *see also doc. 249* ¶ 247. He investigated, and "learned that this was an isolated incident." *Doc. 39-1* ¶ 119. "[Principal] Rava did not speak with Adreya about the incident." *Doc. 249* ¶ 254. Principal Rava also did not notify Tech's Title IX coordinator or Tech's

---

[6] In their statement of material facts, the defendants characterize Principal Rava's action regarding Pieczynski's discipline referral as "immediate[.]" *Id.* ¶ 117. Harden states that "[t]here is a genuine issue of material fact as to whether [Principal] Rava 'immediately took action.'" *Doc. 49* ¶ 117. Upon review of the evidence cited by the parties, we agree that there is a fact dispute regarding the conclusion that Principal Rava's actions as described herein can be fairly described as immediate. As described above, he spoke to the offending student the same day as the name-calling incident, but the offending student's in-school suspension did not begin until the following day. Moreover, Harden cites to evidence that supports her assertion that "[Pieczynski] later learned through students of his that the student continued to bully Adreya throughout the remainder of the day following Pieczynski removing the student from class, indicating that the student was permitted to return to class with Adreya where he continued to bully her." *Id.* ¶ 117 (citing *doc. 39-10* at 12). Again, the defendants do not argue that this statement would be inadmissible as hearsay or for any other reason. Thus, because Harden cites to record evidence creating a genuine factual dispute, we will cite to Harden's version of this fact.

Compliance Officer of the name-calling incident. *Id.* ¶¶ 255–56.  Principal Rava then "issued discipline to the offending student"—specifically three days of in-school suspension to begin the next day, September 30, 2021. *Id.* ¶¶ 120, 122; *see also doc. 39-6* at 11.  "Tech utilizes a progressive discipline model and outlines what offenses amount to expellable only and what typically falls under suspension." *Doc. 39-1* ¶ 124.  Tech's Title IX Compliance Officer, Dr. Thomas Duffy ("Dr. Duffy"), "was not notified of the discriminatory bullying experienced by Adreya despite being the Compliance Officer." *Doc. 249* ¶ 250.  "[Dr.] Duffy did not know whether Adreya was offered supportive measures under Tech's discrimination policy[,]" or "whether Tech's Title IX coordinator was notified of the discriminatory bullying." *Doc. 249* ¶¶ 251–52.

According to Pieczynski, "he later learned through students of his that the [offending] student continued to bully Adreya throughout the remainder of the day following Pieczynski removing the student from class, indicating that the student was permitted to return to class with Adreya where he continued to bully her." *Doc. 49* ¶¶ 117, 125, 248; *see also doc. 39-1* ¶ 121.[7]  Principal Rava and Dr. Duffy were not aware of this continued bullying. *Doc. 39-1* ¶ 121; *see also doc. 49*

---

[7] The defendants state in the statement of material facts that "Mr. Pieczynski testified that other students reported to him later that the offending student continued to refer to [Adreya] b[y] her 'dead name' for the remainder of that school day, but this was not known to Tech." *Id.* ¶ 121.  Harden counters that "[t]here is a genuine issue of material fact whether the offending student's repeated

¶¶ 249–50. "When asked whether he would have permitted [the offending student] to return to class after [he] discriminated against [Adreya], Dr. [ ] Duffy responded: 'Based on everything I know now sitting here looking back, absolutely not.'" *Id.* ¶ 257.

"[Adreya] only attended school the day after this incident and then she did not return." *Id.* ¶¶ 123, 140. After the day of the name-calling incident, Adreya did not interact with the offending student again.[8] *See doc. 49* ¶ 125; *doc. 39-1* ¶¶ 125, 139; *see also doc. 39-6* at 22 (detailing the structure of in-school suspension and the fact that the suspended student does not interact with other students during his suspension).

_____

bullying of Adreya was known to Tech. While the portions of the record cited by Defendants indicate that [Principal] Rava and [Dr.] Duffy were not aware of the repeated bullying, this does not demonstrate that Tech was not aware of the bullying." *Doc. 49* ¶ 121. Because Harden cites to evidence creating a genuine factual dispute, we cite to Harden's version of the fact.

[8]  In the statement of material facts, the defendants state that "[t]he record indicates that [Adreya] and the offending student did not interact after that incident." *Doc. 39-1* ¶ 125. Harden points to a dispute regarding whether Adreya and the offending student interacted throughout the day after the name-calling incident itself. *Doc. 49* ¶ 125. Looking at the evidence cited by all parties, we conclude that Harden has pointed to a genuine dispute of material facts as to whether or not Adreya and the offending student interacted later in the school day on the date of the name-calling incident. *See doc. 39-10* at 12; *see also* n.5 *supra*. But there is not a dispute regarding whether the offending student and Adreya spoke again after the day of the name-calling incident. *See doc. 39-6* at 22.

Harden learned of the name-calling incident only months after Adreya's death when Pieczynski "advised her that he reported [the name-calling incident] to [Principal] Rava." *Doc. 39-1* ¶¶ 126–27. Prior to Adreya's death, Harden knew of only one other incident at Tech. *Id.* ¶ 128; *see also id.* ¶ 131 ("Other than the honking incident, [Adreya] never shared any issues with her teachers or other students while at Tech."). On the day following the name-calling incident, Adreya was walking home from school when an unidentified person "'blew the horn and scared her,' which caused her to fall down a hill and hurt her knees" (hereinafter "the honking incident"). *Id.* ¶ 128, 130. After the honking incident, "[Adreya] told [Harden] she did not want to go back to Tech." *Id.* ¶ 129. That weekend, "[Adreya] had a respiratory infection[,] and she did not go to school the following Monday." *Id.* ¶ 210. "[Adreya] did not go back to Tech after" the honking incident. *Id.* ¶ 132.

The night before Adreya died was the last time Harden spoke to her. *Id.* ¶ 211. "The next day," October 5, 2021, "[Adreya] was found unresponsive in her bed by [Harden's] boyfriend at the time." *Id.* ¶¶ 4, 212. "[Adreya] died of an overdose of her own medication." *Id.* ¶ 214. She did not leave a suicide note. *Id.* ¶¶ 4, 213. Adreya did, however, "change[] her Instagram status to deceased" and "changed her Instagram caption to 'funeral services and cemetery.'" *Id.* ¶ 4, 213.

**D.  The School District's and Tech's Relevant Policies.**

"On June 26, 2014, Act 71 was signed into law in Pennsylvania which required school entities to (1) adopt a youth suicide awareness and prevention policy and (2) provide ongoing professional development in youth suicide awareness and prevention for professional educators in building serving students in grades 6[–]12." *Doc. 49* ¶ 227.  "The Act required school districts to do so by the 2015[–]2016 school year." *Id.*

**1.  The School District's Policies.**

The School District's Policy 819 ("SD Policy 819"), "Suicide Awareness, Prevention, and Response," was adopted on June 10, 2015. *Doc. 39-1* ¶ 52; *see also doc. 49* ¶ 230.  SD Policy 819 "identifies bullying as a suicide risk factor and points to resources on youth suicide awareness and prevention programs." *Id.* ¶ 231.  SD Policy 819 "accounts for training to students and staff" and "includes methods of prevention and intervention as well as other helpful tools/resources." *Id.* ¶¶ 53, 54.  It also mentions resources, including "a link to the American Foundation for Suicide Prevention's model policy" and a link to "The Trevor Project, described by Wyoming Valley as 'the leading national organization providing crisis intervention and suicide prevention services to lesbian, gay, bisexual, transgender, and questioning youth.'" *Id.* ¶¶ 232–33 (quoting *doc. 49-4* at

9).  The Trevor Project, in turn, "notes that LGBTQ+ young people are more than four times as likely to attempt suicide than their peers." *Id.* ¶ 234.  "The School District has trained its employees regarding suicide prevention on October 31, 2018[;] September 20, 2018[;] January 24, 2020[;] March 13, 2020[;] [and] May 6, 2022." *Id.* ¶ 55 (citations omitted).

The School District's Policy 248 ("SD Policy 248"), "Unlawful Harassment," "was adopted on April 12, 1989, and last revised December 3, 2018." *Id.* ¶ 56.  "[SD Policy 248] addresses harassment on the basis of sex and the protocols related thereto." *Id.* ¶ 57.

The School District's Policy 249 ("SD Policy 249"), "Bullying/Cyberbullying," "addresses bullying and references discrimination." *Id.* ¶¶ 58, 59. "Generally speaking, the School District had policies in place addressing 'equal rights [for] all students regardless of their demographics or their sexual orientation." *Id.* ¶ 60.  And "School District staff were aware of these policies." *Id.* "The School District also has internal practices regarding transgender students including honoring their preferred names and pronouns." *Id.* ¶ 62.

### E.  Tech's Policies.[9]

Tech Policy 103, "Discrimination/Title IX Sexual Harassment Affecting Students," defines sexual harassment as "conduct on the basis of sex" including, among other things, "unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it denies a person equal access to a [Tech] education program or activity." *Doc. 39-1* ¶¶ 134, 135.  "[Tech] Policy 103 dictates that in the event there is harassment that falls under this policy, the building administrat[o]r must be contacted[,] and that person shall promptly notify the Title IX coordinator."[10] *Id.* ¶ 136.  Tech Policy 103 also states that "[t]he Title IX Coordinator shall promptly contact the complainant regarding the report to gather additional information as necessary, and to discuss the availability of supportive measures" and "shall consider the complainant's wishes with respect to supportive measures and reasonable safety concerns." *Doc. 49* ¶ 239 (quoting *doc. 49-9* at 9).  Tech Policy 103 "was adopted on March 25, 2019[,]" but revised in 2022. *Id.* ¶¶ 134, 141.  "[T]here is nothing on the record to establish the difference between the" 2019 version which was in place at the time of Adreya's death and

---

[9] "Tech is governed by a Joint Operating Committee, which is comprised of board members from its sending school districts[,]" and "is responsible for creating policies for Tech." *Id.* ¶¶ 69–70.

[10] "[Principal] Rava is the building administrator for Tech." *Doc. 49* ¶ 253.

the revised version.[11] *Id.* ¶ 141.  It is undisputed, however, that "[a]lthough the [name-calling] incident between [Adreya] and the offending student meets the definition of sex-based harassment, [Principal] Rava handled the matter as a bullying-like activity."[12] *Id.* ¶ 137.  Tech Policy 103 "offers to students who are victims of discrimination certain supportive measures such as counseling

---

[11] In the statement of material facts, the defendants state: "It cannot be said that the requirement to involve the Title IX coordinator was required at the time of the altercation." *Doc. 39-1* ¶ 142.  But to support this statement, the defendants cite to the record by referring back to the citation for paragraph 141, which itself refers back to paragraph 140 which cites "J.A. Exhibit A at BS SD00042". *See id.* ¶¶ 140–142.  The page and line numbers included in the citation for paragraph 141 cannot be found in Exhibit A at bates stamp SD00042, which is a record of Adreya's attendance (*doc. 39-3* at 84).  We recommend the defendants utilize more caution when citing to the record in the future.  This is not the only location where an "*id.*" is clearly referring to something other than what was last cited.

It is possible the defendants intended to refer to Exhibit D, the deposition of Principal Rava (*doc. 39-6* at 17).  In this portion of Principal Rava's deposition, Harden's attorney asks Principal Rava whether he knows if the requirement to notify the Title IX coordinator was in the 2019 version of Tech Policy 103. *Id.* Principal Rava answers that he "doesn't recall that part[.]" *Id.*

Harden states in her counterstatement of material facts that "[t]here is a genuine issue of material fact as to whether Policy 103 required involvement of the Title IX coordinator at the time of the altercation" because the "[d]efendants have produced no documentation in discovery indicating that the policy was different in 2021." *Id.* ¶ 142.  But Harden does not cite to the record.

After reviewing the statement of material facts and the counterstatement of material facts, and the evidence the parties cite in support thereof, we conclude that there exists a genuine issue of material fact regarding what exactly Tech Policy 103 required in 2021 at the time of Adreya's death.

[12] The defendants also state: "Moreover, it was an isolated incident that did not deny [Adreya] access to a Tech program or activity." *Doc. 39-1* ¶ 138.  As discussed above, there is a genuine dispute whether the name-calling incident should be considered an isolated incident because the offending student may have

. . . that are not offered to students under the bullying policy." *Doc. 49* ¶¶ 237–38.

Tech Policy 249, "Bullying/Cyberbullying," was adopted on March 25, 2019, and last revised August 23, 2021. *Id.* ¶ 143.  Tech Policy 249 states that:

> Every report of alleged bullying that can be interpreted at the outset to fall within the provisions of policies addressing potential violations of law against discrimination and discriminatory harassment shall be handled as a joint, concurrent investigation into all of the allegations and coordinated with the participation of the compliance officer and the Title IX coordinator.  If, in the course of a bullying investigation, potential issues of discrimination are identified, the Title IX Coordinator shall be promptly notified, and the investigation shall be conducted jointly and concurrently to address the issues of alleged discrimination as well as the incidents of alleged bullying.

*Doc. 49* ¶ 236; *see also doc. 39-1* ¶ 144.

Turning to Adreya's situation, the name-calling incident occurred on Wednesday, September 29, 2021, and the offending student served his in-school suspension on Thursday, September 30; Friday, October 1; and Monday, October 4. *Id.* ¶ 148.  "During that timeframe, [Adreya] and the offending student did not interact again." *Id.* ¶ 149.  "[Adreya] was found dead on October 5[, 2021]." *Id.*

---

returned to class with Adreya and continued to bully her the rest of the day. *See* n.5 *supra*.  Furthermore, according to Harden, "the assertion that the bullying 'did not deny Adreya access to a Tech program or activity' is a legal conclusion, not a statement of fact." *Doc. 49* ¶ 138.  We agree.  We will thus adopt Harden's version of this fact.

¶ 150.  Thus, "less than a week elapsed between the [name-calling] incident and [Adreya's] death." *Id.* ¶ 147.  Dr. Duffy, Tech's Title IX compliance officer, "learn[ed] about the incident via email on October 7, 2021—two days after [Adreya's] death." *Id.* ¶ 146.

"Tech . . . has internal practices regarding transgender students such as honoring their preferred names and pronouns." *Id.* ¶ 169.  But, although Tech is subscribed to a policy service from the Pennsylvania School Boards Association through which it received a policy update regarding Pennsylvania Act 71 in April 2015 (*see doc. 49* ¶¶ 228–29), "Tech did not enact an official Joint Operating Committee policy regarding suicide awareness prevention and response until March 28, 2022[,]" after Adreya's death. *Id.* ¶ 151.  Tech had, however, "procedures in place regarding suicide awareness and trained its employees on the same."[13] *Id.* ¶ 152.  Specifically, on February 2020, "a training occurred . . . which

---

[13] In the statement of material facts, the defendants state that "[i]t is also believed that Tech students receive education on suicide awareness and prevention in health class." *Doc. 39-1* ¶ 159.  To support this assertion, the defendants cite to lines in Dr. Duffy's deposition in which the question and answer are as follows:

> Q. Prior to implementation of this policy, did students receive education on suicide awareness and prevention?
> A. I believe that that would be part of the wellness or the health class.

*Doc. 39-7* at 8.  Without citing to the record, Harden states in her counterstatement of material facts that "[t]his paragraph does not constitute a statement of material fact." *Doc. 49* ¶ 159.  Because the statement simply states that someone (presumably Dr. Duffy based on the record citation) *believes* that students received education on suicide awareness and prevention in health class, we find that there is

addressed youth suicide, awareness, prevention training as well as school

violence[,]" and on March 12, 2021, there was an in-service training "which again

addressed youth suicide, awareness, and prevention training." *Id.* ¶¶ 153–54.

"Tech also provided training on other relevant topics: mindfulness training, equity

training, social and emotional learning, and diversity training." *Id.* ¶ 158 (citations

---

a genuine dispute whether or not the students did receive education on suicide awareness and prevention.

    The defendants also state in the statement of material facts: "Based on the same, Tech staff were trained and expected to notice the warning signs for students who appear to be at risk." *Doc. 39-1* ¶ 167.  The preceding paragraph, to which perhaps the defendants refer with the phrase "based on the same," simply states that "[t]he Student Handbook is approved by the Joint Operating Committee." *Id.* ¶¶ 166–67.  But rather than point to the Student Handbook to support this statement, the defendants point instead to another portion of Dr. Duffy's deposition in which he states:

> I think the expectation for all teachers is that if they see a student who appears to be at risk, that they make a referral likely first and foremost to the guidance counselor, possibly the SAP team.

> And I think there's an expectation of all teachers in all schools to have been trained even prior to earning their certificate as to what at-risk behaviors can look like in a student.

*Doc. 39-7* at 10.  In the counterstatement of material facts, Harden responds to the assertion that "Tech staff were trained and expected to notice the warning signs for" at-risk students by stating, "This paragraph does not constitute a statement of material fact but rather a conclusion as to what the evidence demonstrates." *Doc. 49* ¶ 167.  Because the evidence to which the defendants refer only shows that Dr. Duffy "thinks" that there is an expectation that teachers are trained in at-risk behaviors and then will refer students exhibiting such to the guidance counselor, we conclude there is a genuine dispute regarding whether or not "Tech staff were trained and expected to notice the warning sides for students who appear to be at risk." *See doc. 39-1* ¶ 167.

omitted).  Tech also requires newly hired faculty to attend training regarding "at-risk and observable behaviors, which relate to student suicide and prevention." *Id.* ¶ 160.  Ogurkis, Tech's guidance counselor, "functions as a Suicide Prevention Coordinator" and "confirmed he received training regarding suicide awareness." *Id.* ¶¶ 155–56.  Pieczynski also "confirmed he received training regarding suicide awareness." *Id.* ¶ 157.

"Tech also has the Student Assistance Program ("SAP")[,]" which "is also a Joint Operating Committee policy . . . which was adopted on May 23, 2019." *Id.* ¶¶ 161, 165.  "The function of and resources related to the SAP are included in the Student Handbook." *Id.* ¶¶ 164, 166.  "The SAP team includes Tech's guidance counselor, trained teachers, the school nurse, and the school principal." *Id.* ¶ 162. SAP "involves not only a formal referral process but also a consultation element where if a teacher observed at-risk behaviors they are trained to refer the same to the SAP." *Id.* ¶ 161.  "SAP referrals can come from students, parents, teachers, counselors, administrators, etc." *Id.* ¶ 163.  "Ogurkis confirmed that the SAP included referrals for students at-risk for suicide." *Id.* ¶ 168. The SAP policy, however, "does not mention suicide." *Doc. 49* ¶ 235.

## V.  Discussion.

Harden's remaining claims against the defendants are all brought pursuant to § 1983.  "Section 1983 imposes civil liability upon any person who, acting under color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).  Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.*  To establish a claim under § 1983, the plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Here, Harden brings § 1983 claims against the School District, Principal Rava, and Tech for failure to train and for sex-based discrimination.


### A.  The School District.

As to Harden's claims against it for failure to train, the School District argues that "there is nothing in the record to support [Harden's] claims that a state actor violated [Adreya's] constitutional rights" because "[Adreya] had not attended school in person at the School District for approximately two and a half years[,]" "had limited interaction with teachers," and "nothing in the record supports that

they did not accommodate her preferred name and pronouns." *Id.* at 18.  Moreover, "neither [Harden] nor [Adreya] ever reported any issues let alone sex-based harassment." *Id.*  In the alternative, the School District asserts that it "provided and implemented sufficient training, procedures, and policies regarding student suicide and gender non-conforming students[,]" and it cites SD Policy 819, SD Policy 248, SD Policy 249, and the many trainings held on the subject. *Id.* at 19–20.  The School District also argues that "the record fails to establish deliberate indifference" because of the accommodations the School District offered or provided to Adreya. *Id.* at 20–21.  Additionally, according to the School District, Harden fails to establish causation because "[Adreya] was not the School District's student at the time of her suicide" and had not been educated by the School District "for the entire school year prior[.]" *Id.* ¶ 22.

As to the sex-based discrimination claim Harden brings against the School District, in its brief in support, the School District argues that the claim "fails under both the class-of-one and traditional theories because the record fails to show that [Adreya] was treated differently than similarly situated individuals." *Id.* at 26. "Alternatively," according to the School District, "there is no evidence to support intentional discrimination." *Id.*  Again, the School District points to the accommodations it offered to Adreya which they classify as "the same opportunities and accommodations as all School District students." *Id.* at 27.

34

In her brief in opposition to the motion for summary judgment, Harden "consents to entry of summary judgment as to all counts against Wyoming Valley School District (Counts VI and VIII)." *Doc. 50* at 3. Harden explains that she "recognizes certain of [her] claims are untenable after discovery" and that she wants to avoid "burden[ing] the Court[.]" *Id.*

In light of the foregoing, we will grant the motion for summary judgment as to all claims against the School District.

### B. Tech and Principal Rava.

#### 1. Sex-Based Discrimination Claims.

Harden brings claims against Tech and Principal Rava for violating her rights as protected by the Equal Protection Clause. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is a direction that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.

Under the traditional theory, "[t]o prevail on [an] equal protection claim, [a plaintiff] must show that the Government has treated [her] differently from a

*similarly* situated party *and* that the Government's explanation for the differing treatment does *not* satisfy the relevant level of scrutiny." *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 348 (3d Cir. 2017) (italics in original). "To state an equal-protection claim, Plaintiffs must allege (and ultimately prove) 'intentional discrimination.'" *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015) (quoting *Washington v. Davis*, 426 U.S. 229, 241 (1976)). "[M]ere unequal treatment or adverse effect" is not sufficient. *Jewish Home of E. PA v. Centers for Medicate & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012). Rather, the plaintiff "must show that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985) (quotation marks omitted)).

Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated others. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). To prevail on a class-of-one claim, the plaintiff must demonstrate that: (1) the defendant treated him differently from others similarly situated; (2) the

defendant did so intentionally; and (3) there was no rational basis for the difference in treatment. *Hill*, 455 F.3d at 239.

Without citing case law, Tech and Principal Rava argue that "the record fails to establish that [they] treated similarly situated students differently from [Adreya]." *Doc. 39* at 33. Specifically, Tech and Principal Rava posit that "[Adreya] was afforded the same opportunities and accommodations as all Tech students." *Id.* Specifically, according to Tech and Principal Rava, they "noted and honored her preferred name[,]" disciplined the offending student who carried out the "single incident of sex-based harassment carried out by a student[,]" and did not "blame" Adreya for the name-calling incident or otherwise discipline her at all while she was a Tech student. *Id.* Accordingly, Tech and Principal Rava argue, both the class-of-one and traditional theories fail. *Id.* at 33–34. Principal Rava argues that in the alternative he is entitled to qualified immunity as to the equal protection claim because no constitutional violation occurred. *See id.* at 34–35 ("It cannot reasonably follow that the aforesaid [facts] amount[] to a constitutional violation, or alternatively, that the Individual Defendant's actions were objectively unconstitutional in nature. Moreover, for an equal protection claim, a plaintiff must prove intentional discrimination, and the record does not support the same.").

For her part, Harden agrees that her equal protection claim against Tech is "untenable." *Doc. 50* at 3. Accordingly, Harden "consents to entry of summary

judgment" as to the equal protection claim against Tech (*id.*), and we will grant the motion for summary judgment as to that claim.  Harden maintains, however, that her equal protection claim against Principal Rava should go forward.

As summarized above, Principal Rava argues that the § 1983 Equal Protection Clause claim fails because he did not violate any of Adreya's constitutionally protected rights.  Similarly, Principal Rava argues that he is entitled to qualified immunity because he did not violate Adreya's constitutional rights, not because the alleged constitutional violation was not clearly established.  For her part, Harden argues that because Principal Rava "let [the offending student] return to class with Adreya where he was free to continue harassing Adreya unabated[,]" he "violated Adreya's constitutional right to be free from sex-based discrimination." *Id.* at 22.  According to Harden, "it is sufficiently clear that a reasonable official would understand that permitting a student who had just been removed from class for discriminating against another student to return to class with his victim would result in further violation of the victim's rights." *Id.* at 23 (citing *Nicole M. v. Martinez Unified Sch. Dist.*, 964 F. Supp. 1369, 1383 (N.D. Cal. 1997)).  Harden further argues that Principal Rava responded unreasonably by not following the school's discrimination policy for the name-calling incident. *Id.* at 25.

38

In his reply brief, Principal Rava argues that "[t]he record is completely devoid of any evidence to support that [he] intentionally violated [Adreya's] constitutional rights." *Doc. 51* at 9.  Much of his rebuttal, however, relies on his position that "[t]here is absolutely no evidence to support that these students continued to interact[.]" *Id.* at 9–10.  This is contrary to the record, however. Above we concluded there is a genuine dispute whether or not the offending student was sent back to class in which he again interacted with and harassed Adreya.  Harden pointed to Pieczynski's deposition in which he testified that, although he did not recall the offending student returning to his class, he was told by other students that the offending student did return to class with Adreya where the offending student continued to bully her.  The defendants, for their part, point to evidence that this is "unknown"—which does little for their argument that the record clearly indicates this event did *not* happen.  Accordingly, we dismiss argument based on the defendants' assertion that the offending student did not return to class with Adreya the day of the name-calling incident, prior to the start of his in-school suspension.

Neither the Third Circuit Court of Appeals nor the United States Supreme Court "have . . . addressed whether the Equal Protection Clause protects students from a school's deliberate indifference to student-on-student harassment[.]" *L.S. v. Hanover Area Sch. Dist.*, No. 3:22cv234, 2024 WL 2393038, at *22 (M.D. Pa.

May 23, 2024).  But there is "a robust consensus of persuasive authority" indicating that the Equal Protection Clause does provide that protection. *Id.* (collecting cases).  Thus, "[a] plaintiff alleging an Equal Protection claim based on student-on-student harassment must allege" (1) "that she was subjected to the discriminatory peer harassment"; and (2) "that school officials responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of the known circumstances." *Doe by Nied v. Riverside School District*, No. 3:23-CV-1118, 2024 WL 5204181 (M.D. Pa. Dec. 23, 2024) (quoting *Zavada v. East Stroudsburg Univ.*, No. 3:23-CV-1118, 2024 WL 4311492, at *9 (M.D. Pa. Sept. 26, 2024) (itself quoting *Feminist Majority Found. V. Hurley*, 911 F.3d 674, 702 (4th Cir. 2018))) (internal quotation marks omitted).

As summarized above, the record contains evidence from which a fact finder could find that Adreya was subjected to discriminatory harassment at the hands of the offending student during the name-calling incident.  Harden has also pointed to evidence supporting her argument that Principal Rava's response to the harassment was "clearly unreasonable in light of the known circumstances"—specifically, (1) that Principal Rava let the offending student return to class with Adreya prior to beginning his in-school suspension the following day (which Duffy stated he would not have done); and (2) that Principal Rava did not treat the name-calling

incident as an instance of discrimination rather than mere[14] bullying.  Accordingly, viewing the facts in the light most favorable to Harden, we find a genuine issue such that it is up to a finder of fact to find whether Principal Rava sent the offending student back to class with Adreya and whether his response was clearly unreasonable in light of the known circumstances.

In the alternative, Principal Rava asserts that he is entitled to qualified immunity.  State actors are "entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018).  Principal Rava's argument regarding his alleged entitlement to qualified immunity depends on the conclusion that "[t]he record fails to show that [he] violated [Adreya's] constitutional rights." *Doc. 39* at 35.  In other words, it argues the first prong is not established.  But, as described above, we do not find that conclusion to be true at this juncture.  We have concluded a genuine dispute exists regarding Principal Rava's response to the name-calling incident and that such a dispute is material.

---

[14] We do not wish to trivialize bullying that does not have discrimination baked in.  Instead, we use the word "mere" to differentiate between the type of conduct to which Tech Policy 249 applies solely and the type of conduct to which Tech Policy 103 also applies.

Principal Rava does not develop an argument regarding whether this right is clearly established, instead simply conclusively stating that the facts as he summarizes them cannot lead to the conclusion "that [Principal Rava's] actions were objectively unconstitutional in nature." *Doc. 39* at 34–35. To the limited extent Principal Rava argues that this right was not clearly established, we disagree. "To be clearly established, a . . . rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589–90 (internal quotation marks omitted) (internal citations omitted). As another judge in our district recently found, "[s]ix Courts of Appeals . . . have directly acknowledged the right claimed by [Harden] on behalf of [Adreya]." *L.S. v. Hanover Area Sch. Dist.*, 2024 WL 2393038, at *22. Thus, we, like the court in *L.S.*, "find[] a robust consensus of persuasive authority exists regarding the right to be free from the deliberate indifference of school officials to reports of student-on-student sexual harassment." *Id.* Accordingly, we reject Principal Rava's qualified immunity argument. We will, therefore, deny the motion for summary judgment as to the equal protection claim against Principal Rava.

## 2. Failure-to-Train Claims.

Harden also brings failure-to-train claims against Principal Rava and Tech. "[A] failure to train claim requires a plaintiff to 'identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect deliberate indifference to whether constitutional deprivations of the kind alleged occur.'" *Palakovic v. Wetzel*, 854 F.3d 209, 233 (3d Cir. 2017) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991)). When the failure-to-train claim is brought against a municipality, a plaintiff must show that his or her injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)). A plaintiff asserting a municipal liability claim based on a failure or inadequacy of training, supervision, or discipline does not need to show an unconstitutional policy. *Estate of Roman*, 914 F.3d at 798. Rather, she must show that the municipality's failure to train, supervise, or discipline "its employees 'reflects a deliberate or conscious choice.'" *Id.* (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)). In this regard, the plaintiff must show 'a failure or inadequacy amounting to deliberate indifference on the part of the municipality." *Forrest*, 930 F.3d at 106. This requires a showing that "(1)

municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* Only when the failure to train amounts to deliberate indifference "'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 173 L.Ed. 2d 417 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997). Although the plaintiff must ordinarily show "[a] pattern of similar constitutional violations" in order to prove deliberate indifference in the failure to train context (*Connick v. Thompson*, 563 U.S. 51, 62 (2011)), the Supreme Court has also suggested that a single incident may sustain deliberate indifference when "the need to train officers . . . can be said to be 'so obvious,'" that the failure to do so would predictably lead to recurrent violations of constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989). Moreover, "'the identified deficiency in [the municipality's] training program must be closely related to the ultimate injury;' or in other words, the deficiency in training [must have] actually

44

caused the constitutional violation." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *City of Canton*, 489 U.S. at 391).

Tech and Principal Rava argue that Harden's failure-to-train claims fail as the record does not support evidence to satisfy any of the elements required to prevail. *Doc. 39*. Harden disagrees. *Doc. 50*. Notably, however, the arguments in Tech and Principal Rava's brief in support of the motion for summary judgment only provide arguments regarding Tech's entitlement to summary judgment. *See doc. 39*. Although the brief in support includes conclusory statements that "the Tech Defendants are entitled to judgment as a matter of law[,]" the substantive arguments each pertain only to Tech's liability for the claim under *Monell*. *See id.* Accordingly, we will deny the motion for summary judgment as to the failure-to-train claim against Principal Rava.[15]

---

[15] Tech and Principal Rava argue in the alternative that Principal Rava is entitled to qualified immunity as to each claim against him. Their arguments are largely conclusory, however. In the brief in opposition, Tech and Principal Rava point out that Principal Rava did not know Adreya or that she was transgender until he received the referral regarding the name-calling incident, that he "processed the referral like he would any other by conducting an investigation and issuing discipline[,]" and that he "treated the [name-calling] incident as a bullying-like activity." *Doc. 39* at 35. After listing these facts, Tech and Principal Rava state that "[i]t cannot reasonably follow that the aforesaid amounts to a constitutional violation, or alternatively, that [Principal Rava's] actions were objectively unconstitutional in nature." *Id.* This argument lacks substance and includes nothing regarding the failure-to-train claim specifically. Without more, we cannot grant Principal Rava's motion for summary judgment as to the failure-to-train claim against him on the basis of qualified immunity.

As to the failure-to-train claim against Tech, however, we analyze the element of causation below.  Because we ultimately conclude that Harden has not made a showing sufficient to establish causation, we do not reach the parties' other arguments.

As to causation, in its brief in support, Tech argues that it cannot be found to have caused Adreya's suicide which it assumes is the alleged constitutional violation. *See doc. 39* at 26–28.  Tech points to other "various traumatic events" Adreya experienced and Adreya's inconsistent medication usage and "mental health history" about which Tech was unaware. *Id.* at 27–28.  Throughout, Tech relies on a Third Circuit opinion which found a school not to be responsible for a student's suicide. *Id.* (citing *Sanford v. Stiles*, 456 F.3d 298 (3d Cir. 2006)).

For her part, Harden argues that neither Tech nor Rava "have [the] authority or expertise" to evaluate factors that may have contributed to Adreya's death by suicide. *Doc. 50* at 18.  In fact, Harden argues, she "could assert with equal authority the cause of Adreya's suicide: Adreya's attendance at a school where her bully was permitted to continue bullying her, where the school administration steadfastly refused to adopt a suicide prevention policy despite being mandated by law to do so." *Id.*  And Adreya points out that *Sanford*, 456 F.3d 298, is not comparable because "*Sanford* was decided in 2006, eight years before Pennsylvania mandated that schools adopt suicide policies in 2015" and "the tragic

reality that student suicide has greatly increased, so much so it compelled Pennsylvania to mandate suicide policies." *Id.* at 19.

When considering causation, we ask whether Harden has "plausibly shown that more or better training would have prevented the alleged injury." *See MDB v. Punxsutawney Christian School*, 386 F. Supp. 3d 565, 584 (W.D. Pa. 2019).  In this case, the injury is Adreya's death by suicide followed by the alleged constitutional violation.  In other words, Adreya's death by suicide as a result of Adreya's exposure to further bullying at the hands of the offending student and the treatment of the name-calling incident as mere bullying rather than under the discrimination policy which, as discussed below, could be found by a finder of fact to have violated Adreya's constitutional rights.

Harden, without citing to the record, argues:

> Rava's treatment of acknowledged discrimination as simply
> "bullying-like" behavior shows an obvious lack of training
> regarding discrimination.  So does Rava's failure to follow
> proper protocols by notifying Tech's Title XI [sic] Coordinator
> and Compliance Officer.

*Doc. 50* at 10.  But the fact of Principal Rava's alleged missteps following the name-calling incident is not itself evidence that Principal Rava was not adequately trained to avoid such missteps.  Myriad other explanations exist for such behavior, including an intentional choice to go against training.  Harden fails to make a showing that it was a lack of training or improper training which resulted in

47

Principal Rava's alleged mishandling of the name-calling incident which, as alleged, in turn resulted in Adreya's death by suicide. Harden has thus failed to make a showing sufficient to establish causation. Her argument regarding certain policies that could have or, according to the Pennsylvania legislature, should have been in place also fails, because she has not shown that the lack of these policies caused the alleged constitutional violation and Adreya's injury thereby. Having failed to make this showing, summary judgment is appropriate. We will, therefore, grant summary judgment as to the failure-to-train claim against Tech.

## VI. Conclusion.

For the foregoing reasons, we will grant the motion for summary judgment insofar as it seeks summary judgment on the claims against the School District and Tech, and we will deny the motion for summary judgment in all other respects. Accordingly, the § 1983 claims against Principal Rava found in Counts V and IX remain. An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge